Connor, John P., J.
This case involves an employer’s reduction in force that resulted in a sixty-year-old employee’s termination. The defendant employer, Babcock Borsig Power, Inc. (“Babcock”) terminated the plaintiff Harold Saposnik (“Saposnik”), from his position as a Senior Buyer in November 2002. Saposnik filed suit alleging that his termination was the result of Babcock’s unlawful discriminatory practices, specifically age discrimination. Babcock has moved for summary judgment on the grounds that Saposnik cannot establish a prima facie case of age discrimination. Alternatively, Babcock argues that even if Saposnik could establish a prima facie case, Babcock has articulated a legitimate non-discriminatory reason for Saposnik’s termination and that Saposnik cannot produce evidence to show that Babcock’s action was merely a pretext for age discrimination.

BACKGROUND

Considered in a light most favorable to the plaintiff, the non-moving party, the facts and reasonable inferences drawn from them follow. Mass.R.Civ.Proc. 56(c). Babcock hired Saposnik on March 1, 1999 as a Senior Buyer when he was fifty-six years old and terminated him at age sixty in 2002.[1] From 1999 to 2002 Babcock’s business designing, developing, installing and servicing coal-fired utility boilers grew. At the time Babcock hired Saposnik, there were two other Senior Buyers in purchasing, Hinkley (“Hinkley”) and Packard (“Packard”), both of whom were fifty-two years old. Paul Cummins (“Cummins”) was the Director of Purchasing. After hiring Saposnik, Cummins hired two additional Senior Buyers in Purchasing: Sal Cilluffo (“Ciliuffo”), age fifty-one was hired into a tem-poraiy position and Dana Hatch (“Hatch”), age forty-seven, was hired into a permanent position in April 2001. In addition, Cummins hired other people into the Purchasing Department (“Purchasing”). In all, eight of the ten people hired were forty-years old or older. Cummins hired other individuals for different Purchasing positions including Buyer and Program Buyer/Expeditor. Three Program Buyer/Expeditors were hired: Shane Wood (“Wood”), who was twenty-six at the time of the layoff; David Bernard (“Bernard”), who was forty-four; and Inge Thompson (“Thompson”), who was fifty-one, all of whom survived the layoff. Jason Rudman (“Rudman”), who was in his twenties, transferred into Purchasing as a Program Buyer/Expeditor in May 2002.
By fall 2002, Purchasing had twenty-one employees: one Director, four Managers (Procurement, Logistics and Expediting, Project Procurement, and Procurement Environmental Systems), five Senior Buyers, one Buyer, four Program Buyer/Expeditors, two Purchasing Expeditors, a Senior Secretary, one Cost Analyst, one Purchasing Administrator/Buyer, and one Project Assistant.[2] They ranged in age from twenty-three to sixty years old. Brian Kennedy (“Kennedy”) and Lewis Lausten (“Lausten”) were managers, each over forty years old. In all, eighteen employees in Purchasing were over forty years old.
Purchasing positions were differentiated by grade classification. A Senior Buyer was a Grade 14, a Buyer was a Grade 13, and a Program Buyer/Expeditor was a Grade 12. In addition, the qualifications for each job were different. Senior Buyers were required to have a Bachelor’s degree in Business Administration, be a certified purchasing manager or have a minimum of five years purchasing background, two to three of which had to have been in the boiler industry, and possess leadership and negotiation skills, and have a knowledge of business law and accounting. Buyers were required to have a “college education, preferably with a degree in Business or Engineering and three to five years purchasing experience.” Program Buyer/Expeditors were required to have a Bachelor’s degree or 3-5 years working experience as a Buyer.
Job responsibilities and objectives were different among the various Purchasing positions. According to Babcock job descriptions, during 2002, Senior Buyers were responsible to formulate procurement strategies, create bidding packages, negotiate costs, establish a minimum of three new suppliers, implement work packages to ensure performance-based material and equipment purchases, reduce costs by ten percent, establish “supplier of choice” agreements, provide commodity costs, develop and maintain supplier relationships, recover charges attributable to suppliers, provide bid evaluations to management, and proficiently use conformed contracts and negotiations of terms and conditions purchase. In addition, Senior Buyers had a “signing limit” of $175,000.00. Program Buyers/Expeditors, on the other hand, ensured continuity and coordination of information and activities, monitored supply priorities, performed supply audits, executed, tracked and expedited purchase orders, and apprised project and purchasing management of project status and data. A Program Buyer/Expeditor had a $75,000.00 “signing limit.” No verbatim overlaps in job responsibilities or objectives exist between the Senior Buyer and Program Buyer/Expeditor job descriptions, although the descriptions acknowledge that the Program Buyer/Expediter was to collaborate with and support the Senior Buyer. A dispute exists as to whether the procurement responsibilities were interchangeable among the various purchasing positions as Saposnik contends or whether the responsibility to purchase certain commodities was based on the level of complexity, the managers being responsible for the most complex, followed by Senior Buyers, Buyers, and Program Buyer/Expeditors as responsible for the progressively less complex as Babcock argues.
In addition to specific job responsibilities, each Manager, Senior Buyer, Program Buyer/Expeditor, or Buyer was assigned specific commodities to procure. As of May 8, 2002, six months prior to the layoff, *613 Saposnik was specifically responsible to procure twenty-two different commodities including air heaters, burners, evaporators, fuel supply equipment, sonic and vibrating horns, heat exchangers/condensers, heaters, ignitors, instrument and controls, reheaters, scanners, soot cleaning equipment, thermocouples supports, thermocouples, thermometers and thermowells, valves, and valve and duct silencers. Following the layoff, Saposnik’s procurement commodities were distributed among Lausten, Kennedy and Wood.
During Saposnik’s tenure, Babcock conducted annual employee performance evaluations. Saposnik received three annual evaluations as a Senior Buyer from the time period covering March 1999 to March 2002. In each evaluation he scored an overall “3,” meeting most of his goals but not meeting other goals, particularly in the 2000-2001 evaluation period.[3] In each instant when he did not meet a goal, Saposnik’s evaluator, a manager, identified issues that Saposnik needed to improve. Saposnik noted his disagreement with the unmet goals as “constructive criticism,” attributing it as a misread on the part of Babcock as to his “quiet demeanor” and performance with “little fanfare.” Saposnik also received annual monetary bonuses.
Saposnik’s colleagues were also evaluated. Hinkley had three annual evaluations from 1999 to 2002. While Hinkley scored an overall “3" in the first of those evaluations and met his goals, he scored an overall ”4" in the subsequent evaluation periods, 2000-2001 and 2001-2002. In addition, Hinkley frequently exceeded his goals. Packard, another Senior Buyer, also received three annual evaluations, from August 1999 through July 2002. Packard’s overall performance, initially a “4" in 2000, slipped to a ”3" in 2001 and 2002. While he had one or two unmet goals in each of the last two evaluations periods, Packard also exceeded some of his goals. Hatch, newly hired in 2001, had only one annual evaluation prior to the layoff. He scored an overall “4" and exceeded all of his goals, save for one. The fifth Senior Buyer, Ciluffo, did not receive an annual review because he was laid off prior to his first annual evaluation date. Shane Wood, hired in 2000, received one annual evaluation in December 2001 (his second being due after the layoff in December 2002). He was evaluated in the position of "Program Buyer/Expeditor" and received an overall score of “4,” meeting three goals and exceeding the remaining five goals. Saposnik had no basis to determine his job performance relative to that of his co-workers nor did he believe that his performance appraisals were the result of age discrimination.
In fall 2002, Babcock was met with a decreased demand for its products and services. Cummins knew of a downturn in business activity and was informed of the planned layoff in October 2002 by two company executives, Jim Doherty and Tom Ogiba. The executives told Cummins that the layoff would be company wide and include Purchasing. The executives instructed Cummins to evaluate the activity or lack of activity of any commodities, the performance of an individual, and future business as reasons for eliminating any individual in the layoff. Saposnik was aware that there were “not as many projects in the pipeline” in 2002 as there had been.
Cummins had a conversation with Saposnik about the downturn in business activity and informed Saposnik that he would be laid off. Cummins told Saposnik that the “layoff was not [because] of anything [he] did wrong” and that “it was not performance-related.” Cummins provided Saposnik with a severance agreement that contained a separation and release agreement, which included a paragraph that advised Saposnik to consult an attorney. At no time during Saposnik’s tenure did Saposnik hear comments directed to him or others that he considered to be age-discriminatoiy.
Babcock reduced its overall workforce by 66 employees, from 457 to 391. Prior to the layoff the mean age was 47.11 years for all employees. After the layoff the mean age was 47.27 years. Within Purchasing, the mean age prior to the layoff was 48.1 years for twenty-one employees. After the layoff, the mean age was 46.56 years for sixteen employees. After the layoff, sixteen people remained in Purchasing: 1) as Director — Cummins; 2) as Managers — Lausten, and Kennedy, John Jaworski (“Jaworski”) and Thomas Bruback; 3) as Senior Buyers — Hinkley, Packard, and Hatch; 4) as a Buyer — Wood; 5) as Program Buyer/Expeditors — Bernard, Rudman, and Thompson and Douglas Ward; 6) as a Purchasing Administrator/Buyer — Georgianna Mazzone (“Mazzone”); and 7) a cost analyst and a secretary. Five people in purchasing were laid-off, ranging in age from forty-seven to sixty.[4] Babcock retained two sixty-year-old employees, Jaworski, a manager, and Mazzone, as well as the only three employees who were under forty years of age.

DISCUSSION

Summary judgment is appropriate when the moving party shows that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983). When evaluating a summary judgment motion, the court looks at the evidence in the light most favorable to the non-moving party. See Mass.R.Civ.P. 56(c); O’Sullivan v. Shaw, 431 Mass. 201, 203 (2000). The moving party bears the burden of establishing the absence of a triable issue. Pedersen v. Time, Inc., 404 Mass. 14,17(1989). Once the moving party meets this burden, the burden shifts to the non-moving party to allege specific facts establishing the existence of a general issue or issues of material facts; he may not rest merely on the pleadings. Correllas v. Viveiros, 410 Mass. 314, 317 (1991); *614 Godbout v. Cousens, 396 Mass. 254, 261 (1985). Bare assertions and conclusions regarding one’s understanding, beliefs, and assumptions are not enough to withstand a well-pleaded motion for summary judgment. Polaroid Corp v. Rollins Environmental Serv. (N.J.), Inc., 416 Mass. 684, 696 (1993).
“Summary judgment is generally disfavored in the context of discrimination cases based on disparate treatment.” Brunner v. Stone & Webster Eng’g Corp., 413 Mass. 698, 705 (1992) (where motive, intent or state of mind questions are at issue, summary judgment is often inappropriate because they are factual questions) (quoting Flesner v. Technical Communication Corp., 410 Mass. 805, 809 (1991); Anderson v. Bessemer City, 470 U.S. 564, 572-73 (1985)). A defendant’s motion for summary judgment has been upheld when the plaintiffs evidence of intent, motive, or state of mind has been found insufficient to support a judgment in the plaintiffs favor. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440 (1995).
When a plaintiff alleges discrimination based on indirect or circumstantial evidence, the legal analysis to support his claim must satisfy a burden-shifting, three-prong paradigm. Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34,44 (2005) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)). Inmost situations, to establish a prima facie case of termination based on unlawful discrimination under G.L.c. 15 IB, the plaintiff must show: 1) that he was a member of a protected class; 2) that he performed his job satisfactorily; 3) that he was terminated; and 4) that the employer sought to hire a person outside the protected class with similar qualifications. Abramian v. Fellows of Harvard College, 432 Mass. 107, 116 (2000). In a reduction in force case, the first three elements are generally easy to establish because: 1) the age of the employee is not disputed; 2) termination generally is not the result of an employee’s poor performance, per se, because an employee who was not performing well presumably would have been discharged before the layoff; and 3) the employee was, in fact, terminated. Sullivan, 444 Mass. at 41.
The fourth element, however, requires a revised standard which has recently been articulated in Sullivan, 444 Mass, at 45. The plaintiff must produce “some evidence” that the “layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination.” A plaintiff in a protected class cannot establish a prima facie case merely because he was laid off. Sullivan, 444 Mass, at 41, 44. Retaining an employee outside the plaintiffs protected class in the plaintiffs same position may or may not give rise to a reasonable inference of impermissible discrimination. Id. at 44. Even during a legitimate reorganization, an employer is forbidden from reducing its work force on unlawful discriminatory grounds. Id. at 42. Retaining younger workers who ranked lower in performance evaluations in the “same position” as the terminated employee is indirect evidence of discriminatory intent that allows a plaintiff to establish a prima facie case. Id. at 46. In addition, probative statistical evidence showing a disparate impact on members of the protected class may also help establish a prima facie case. Id. at 46, n.16.
In the present case, no dispute exists to the first three elements. Saposnik was sixty years old when he was terminated in November 2002, clearly a member of the protected class. His job evaluations reveal that he performed at least satisfactorily, achieving an overall score of “3" to remain employed prior to the layoff despite some noted deficiencies in his performance. In addition, he received monetary bonuses in some years. Thus, he was not laid off specifically because of ’’poor performance."
As to the fourth element, however, Saposnik has not shown that Babcock “retained other employees outside the plaintiffs protected class in the same position.” Babcock presented admissible evidence within its affidavits that Wood, a twenty-six year old, was not in the same position as Saposnik. First, Saposnik was a Senior Buyer and Wood was a Buyer, each position being qualified by different educational preparation and prior experience, as well as different job responsibilities and job grade, as revealed in Babcock’s job descriptions. In addition, Babcock submitted each of the Senior Buyers and Wood’s job performance evaluations as evidence to show that Saposnik’s job performance was inferior to that of the retained employees.
With such evidence before him, Saposnik has the obligation to respond with evidence, by affidavits or was otherwise provided in the rule, to set forth facts to show that there is a genuine issue for trial. Correllas, 410 Mass, at 317 (citing Mass.RCiv.P. 56(e)). To support his allegation of age discrimination, Saposnik baldly asserts that all the Senior Buyers, Buyers, and Program Buyer/Expeditors performed their job interchangeably. He adduces no evidence to substantiate this allegation relying instead on mere conclusions which he cannot do. Polaroid Corp., 416 Mass. 696. Saposnik has not shown that Babcock retained Wood in place of him. Wood was a Program Buyer/Expeditor, not a Senior Buyer as Saposnik had been. He has offered no evidence to show that Wood was promoted to Senior Buyer after the layoff. While he acknowledges that Wood assumed some of his commodities purchasing responsibilities he has not shown that only Wood assumed all of his purchasing responsibilities. Babcock, in its affidavit, identifies Saposnik’s purchasing responsibilities as being distributed among Wood and two managers, Lausten and Kennedy, both of whom were over forty years old.[5] Saposnik offers no evidence to controvert the purchasing assignment.
Furthermore, Babcock retained the youngest Senior Buyer who was forty-eight, clearly a member of *615 the protected class. In addition, the oldest Senior Buyer was fifty-six following the lay off. That Saposnik was merely the oldest Senior Buyer terminated, without more, is not sufficient evidence to support a reasonable inference that age was a motivating factor in Babcock’s decision to terminate him. Thus, Saposnik has offered no evidence to show that the layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination.
Nor has Saposnik demonstrated by probative statistical evidence discriminatory animus directed toward him. Although the sample size is small, eighty-five (18/21) percent of employees in Purchasing were over age forty prior to the layoff and eighty-one (13/16) percent were over age forty after the layoff, the mean age dropping to 46.56 years from 48.1 years. In addition, within Purchasing, Babcock retained two sixty-year-old employees. Furthermore, the mean age for all employees rose ever so slightly, across the entire organization, from 47.11 years to 47.27 years, following a reduction from 467 employees to 391 employees (nearly fifteen percent). Thus, the statistical evidence is insufficient to prove discriminatoiy animus. Accordingly, Saposnik has not satisfied the fourth element as articulated in Sullivan to establish a prima facie case of age discrimination in a reduction in force case.
Even if Saposnik could establish a prima facie case for discrimination, for purposes of analysis, the employer may rebut the presumption if it can articulate “a legitimate, nondiscriminatoiy reason for its hiring decision” backed by “credible evidence [showing] that the reason or reasons advanced were the real reasons.” Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441-42 (1995) (quoting Wheelock College v. Massachusetts Comm’n Against Discrimination, 371 Mass. 130, 138 (1973)). Babcock’s business activity had slowed down. Saposnik knew the “pipeline was not as busy.” Babcock reduced its overall workforce by nearly fifteen percent and its purchasing workforce by over twenty percent. Cummins was instructed to consider activity or lack of activities of any commodities, the performance of an individual, and future business as reasons for eliminating any individual in the layoff. While Babcock has not produced any evidence of what specific commodities lacked activity or what specific future business were to be effected, it did identify weakness in Saposnik’s performance relative to his colleagues as a basis for the layoff. In addition, none of these factors directly or indirectly implicates age as a factor in deciding which positions to eliminate.
Babcock relies upon the performance evaluations of three other Senior Buyers, Hatch, Packard and Hinkley, all over the age of forty, as evidence to support its position that Saposnik was the weakest performer in the Senior Buyer group. Clearly, the evidence evinces that conclusion when one compares Hatch and Hinkley, each of whom scored “4" in their evaluations overall. As to comparision between Packard and Saposnik, Babcock’s argument that Packard was slightly better than Saposnik is also born out by the evidence as Packard received the same overall score of ”3" in the last of the evaluations but was a better performer in some categories because he exceeded his goals and had no unmet goals. Moreover, Saposnik concedes that he has no basis upon which to judge whether his performance was better than, worse than, or similar to others in his department. Thus, Babcock has met its burden to overcome a presumption of discrimination against Saposnik by articulating a legitimate, non-discriminatoiy reason for terminating Saposnik.
Because Babcock has met its burden to rebut the presumption of a prima facie case of discrimination if one did exist, which, as explained supra, does not, Saposnik would bear the burden to produce evidence that Babcock’s rationale is merely a pretext for its action. Evidence relevant to a plaintiffs showing of pretext may include: 1) application of certain criteria to employees of different [ages]; 2) the employer’s general practices and policies concerning employment of employees of [different age groups]; 3) and the employer’s treatment of the plaintiff during his employment. Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 767 (1986). This Saposnik is unable to do.
First, employee evaluations for Senior Buyers were generic, applying the same performance criteria to all who were evaluated. Babcock’s position descriptions contained different qualifications, experience, and responsibilities among the Senior Buyers, Buyers, and Program Buyer/Expeditors. Senior Buyers had to have a college degree or purchasing experience specific to the industry, or be certified. While one could reasonably infer that Babcock’s preference was to hire older individuals because of the need for a college degree or specific experience, the job appraisal criteria among the positions differed solely on job responsibilities and objectives.
Second, the evidence supports Babcock’s non-discriminatory practices in general employment practices as well. Babcock hired Saposnik at age fifty-six. He joined other Senior Buyers who were in the protected class. Babcock continued to hire other individuals over the age of forty both as Senior Buyers and into other positions, too. The mean age of all employees before and after the layoff was well over forty years, hovering around forty-seven years of age. Moreover, only three employees in Purchasing were outside the protected class before and after the layoff. Thus, one can reasonably infer that Babcock’s general employment practices and policies did not discriminate against those over forty years old.
Finally, Saposnik concedes that he heard no remarks during his employment that could be cast in an age discriminatory light. He acknowledges that his *616 annual performance evaluations were not based on age-related factors. Furthermore, Babcock hired him at age fifty-six, retained him for four years, and provided an annual bonus. All of these factors negate an inference of discriminatory animus toward him based on age.
In summary, Saposnik’s claim that his termination at age sixty is evidence of age discrimination, in the absence of any probative evidence, is insufficient as a matter of law, to prevail in this matter. Accordingly, Babcock’s motion for summary judgment is ALLOWED.

ORDER

For the foregoing reasons, the Defendant’s Motion for Summary Judgment is ALLOWED.

Saposnik was bom on August 24, 1942.

The Purchasing Department (“Purchasing”) consisted of the following people, by job classification and age at the time of the layoff: 1) Paul Cummins, Director, age 44; 2) John Jaworski, Manager: age 60; 3) Lewis Lausten, Manager, age 55; 4) Brian Kennedy, Manager, age 51; 5) Richard HinHey, Senior Buyer, age 56; 6) Sal Cilluffo, Senior Buyer (temporary), age 52; 7) Robert Packard, Senior Buyer, age 56; 8) Harold Saposnik, Senior Buyer, age 60; 9) Dana Hatch, Sr., Senior Buyer, age 48; 10) Shane Wood, Buyer, age 26; 11) Georgiana Mazzone, Purchasing Administrator/Buyer, age 60; 12) Joseph Martini, Purchasing Expeditor, age 53; 13) Carl Hubbard, Purchasing Expeditor, age 54; 14) Thomas Bmback, Project Procurement Manager, age 48; 15) Monique Maher-LeSabre, Cost Analyst, age 51; 16) Jason Rudman, Program Buyer Expeditor, age 23; 17) Douglas Ward, Program Buyer Expeditor, age 41; 18) David Bernard, Program Buyer Expeditor, age 44; 19) Inge Thompson, Program Buyer Expediter, age 51; 20) Donna Jean Hazen, Senior Secretary, age 47; and 21) Paula Chapman, Project Assistant, age 31.

Each performance evaluation required a description of “overall... performance” as denoted by a whole number, with “1" being the lowest and ”5" being the highest.

In addition to Saposnik, Babcock laid off: 1) Sal Cilluffo; 2) Joseph Martini; 3) Carl Hubbard; and 4) Donna Jean Hazen.

Wood assumed procurement responsibilities for instrument and controls, thermocouple supports and thermocouples, valves, and valve silencers. Kennedy assumed purchasing responsibilities for burners, evaporators, fuel supply equipment, ignitor, and scanners. Lausten assumed buying responsibilities for air heaters, sonic and vibrating horns, heat exchangers/condensers, repeaters and soot cleaning.