Laura SINGLETON, Plaintiff

v.

SINCLAIR BROADCAST GROUP, INC. and Patrick Berry, Defendants.

No. 08–CV–30108–MAP.

United States District Court, D. Massachusetts.

Oct. 6, 2009.

David E. Belfort, Michael L. Mason, Corrigan, Bennett & Belfort PC, Cambridge, MA, for Plaintiff.

Jeffrey M. Burns, Kevin T. Smith, Greenberg Traurig LLP, Boston, MA, Margaret L. Argent, Francis R. Laws, Thomas & Libowitz, P.A., Baltimore, MD, for Defendants.

***MEMORANDUM AND ORDER REGARDING DEFENDANT SINCLAIR BROADCAST GROUP'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. No. 23) and DEFENDANT PATRICK BERRY'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 24)***

PONSOR, District Judge.

## I. INTRODUCTION

Defendant Sinclair Broadcast Group, Inc. ("Sinclair") and Defendant Patrick Berry ("Berry") have moved for summary judgment in this employment discrimination suit brought by Plaintiff Laura Singleton. Seven of the eight claims in Plaintiff's First Amended Complaint, filed February 16, 2009, apply to Sinclair; only Count II names Berry. (Dkt. No. 21, Compl.)

Counts I, III, IV, and VIII arise under Mass. Gen Laws ch. 151B and offer claims for retaliation (Count IV) and discrimination based on handicap (Count I), age (Count III), and gender (Count VIII). Count V alleges breach of contract; Count VI charges a violation of the federal Family and Medical Leave Act of 1993 ("FMLA"); and Count VII charges a violation of the Massachusetts Wage Act, Mass.

Gen. Laws ch. 149 § 148. Count II charges Berry with creating a hostile work environment in violation of Mass. Gen. Laws ch. 151B. In addition to compensatory and contract damages, Plaintiff also seeks punitive damages under ch. 151B, § 9. Sinclair and Berry have both moved for summary judgement as to all counts, except Count VI (the FMLA violation), and on the prayer for punitive damages.

For the reasons stated below, Berry's motion for summary judgment will be ALLOWED, and Sinclair's motion for summary judgment will be ALLOWED, in part.

## II. FACTS [1]

### A. Plaintiff's Position with Sinclair.

Plaintiff, now fifty-one years old, worked at WGGB ("the Station"), an ABC television affiliate in Springfield, Massachusetts, as an account executive ("AE") from October 1994 to July 1998. Defendant Sinclair, through a wholly owned-subsidiary, purchased the Station in May 1999. Plaintiff was rehired as an AE shortly thereafter (in June 1999) and continued as an AE until Defendant terminated her employment on July 16, 2007. As an AE, Plaintiff's primary duties were to sell advertising and infomercial time to local advertisers. She normally worked about 40–50 hours a week. Her duties included data entry, traveling to visit clients, and other sales activities. It is undisputed that Plaintiff's work performance was excellent and that she was able to meet her sales goals through 2006, her last full year of employment at the Station.

From January 2006 through March 2007, Defendant Patrick Berry ("Berry") was the Station's Local Sales Manager and Plaintiff's direct supervisor. During that time, the Regional Manager in charge of the Station was Aaron Olander. He was also the General Manager of two stations in Syracuse, New York and worked primarily in Syracuse, not Springfield.

### B. Relevant Sinclair Policies.

Sinclair paid AEs on a commission basis. Plaintiff earned between $80,000 and

---

**1.** The recitation of the facts is limited to those facts that are material to resolving Defendants' motions for summary judgment. Unless another source is cited, the facts are drawn from Dkt. No. 25, Def.'s Statement of Material Facts of Record as to Which There is No Genuine Issue to be Tried, and Dkt. No. 31, Pl.'s Statement of Material Facts. Plaintiff disputes the veracity of certain portions of the record offered by Defendants and supported by evidence obtained during discovery. To the extent that Plaintiff has cited to contrary record evidence that does indeed cast doubt on a particular fact, the court has relied on Plaintiff's version of events. In a number of instances, however, Plaintiff has purported to dispute factual assertions made by Defendants simply on the ground that, at trial, a jury might choose to disbelieve witnesses with any connection to Defendants. While judges are not permitted to make credibility judgments at the summary judgment stage, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (setting out that, at the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter"), Plaintiff cannot create a material issue of fact merely by suggesting that a jury might not believe a witness relating a fact subject to verification. *Sears, Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 18 (1st Cir.1997). The non-moving party must cite some evidence of record that casts doubt on the particular facts asserted by the moving party. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505 (stating that "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'") (quoting Fed.R.Civ.P. 56(e)); D. Mass. R. 56.1 (requiring that a non-moving party's opposition to a motion for summary judgment include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation.").

$97,000 from 2004–2007. During that time, Sinclair compensated AEs as follows: Every two weeks the AEs received a "draw," which in Singleton's case was $1250. The draw amount was essentially an advance on the commissions the AE would earn each month. If an AE earned more commissions in a month than the amount of the draw, the AE would receive a check in the middle of the following month for the difference between the commissions earned and the draw disbursed.

There is some dispute between the parties about when a commission was earned. Plaintiff asserts that a commission was earned as soon as the advertising had aired and was billable. Defendant asserts, and Plaintiff appears to have agreed in her deposition, that AEs were responsible for collections as well as sales and did not earn their commissions until air time was sold, the content aired, the client was billed, and the client actually paid the bill. (Dkt. No. 25, Ex. 1 Singleton Dep. 10/6/08 at 26.) Because commissions were not earned until, at the earliest, the client's content had aired, there could be a delay between the sale of air time and when the AE actually earned the commission.

Additionally, changes to the station schedule or the overselling of air time sometimes prevented the running of content that had been sold. Sales that could not be honored as anticipated were known as preemptions. When a preemption occurred, no commission was paid until the sale was "made good" through the re-scheduling of air time. The parties disagree about whose responsibility it was to try to "make good" on preemptions.

Sinclair had special policies in place to deal with compensating AEs upon the termination of their employment or when they were on vacation or an extended leave. Generally, upon termination, any unused sick, personal, or vacation time would be considered to extend the time during which an AE could earn a commission. Details of that procedure were not specified in the Employee Handbook, but were set forth in a separate Account Executive Statement of Understanding referenced in the handbook. (Dkt. No. 25, Ex. 15 at SBG//00022.)

The Employee Handbook was similarly incomplete with regard to the way compensation would be handled during a AE's vacation or extended leave, stating only that compensation would be "paid according to guidelines established by the General Manager and General Sales Manager." *Id.* Plaintiff neither asked nor was told what the policy was with regards to compensation during a leave of absence until she returned from her first leave of absence. At that time she was informed that Sinclair's policy was to pay an AE commissions earned during a leave of absence, minus any amount of short-term disability payments made to the AE during the leave of absence. Sinclair paid her in accordance with that policy.

Sinclair states, and Plaintiff does not dispute, that its policy regarding medical leave was to grant employees medical leave as required by the FMLA and to terminate employees who were unable to return to work after fully utilizing their FMLA leave. In keeping with this policy, Sinclair terminated William Meyl, then general manager of the Station, in December 2006 after he exhausted all of his available FMLA leave. At the time of his termination, Meyl was battling cancer.

### C. *Plaintiff's First Medical Leave*

In June 2006, Plaintiff requested and was granted medical leave, beginning on or around June 19, 2006. In her amended complaint, Plaintiff states that, at her request, she took this leave pursuant to the FMLA. (Dkt. No. 21, at ¶ 10.) While she

was on leave, she was diagnosed with leiomyoscarcoma ("LMS"), a rare and potentially fatal cancer. With Sinclair's approval, Plaintiff extended her medical leave to accommodate her treatment needs.

While on leave, she received short-term disability payments, which were deducted from the commissions she earned while on leave, as described above. Two other account executives managed her accounts while Plaintiff was on leave, but she remained in contact with some of her clients via email during this time. Plaintiff asserts that the commissions she earned while on leave were unfairly reduced due to a high number of preemptions, many of which were never made good. She asserts that Berry intentionally prevented many of her preemptions from being made good. During her deposition, Plaintiff did admit that the preemptions that remained as of October 2006 were eventually resolved. (Dkt. No. 25, Ex. 33 Singleton Dep. 1/23/09 at 117.) However, she still maintains that she lost $2,739.98 in commissions because Berry ignored her preemptions.

During her time away, Plaintiff spoke regularly with individuals at Sinclair. For example, in late July 2006, she e-mailed a letter to Olander, Sinclair's Regional Manager, informing him of her diagnosis but also expressing her hope to return to work "sooner than later." (Dkt. No. 31, Ex. 7 Singleton to Olander Let. 7/26/09 at 2.) The following day she sent an e-mail to the station's general manager and to Berry, noting recent staff changes and requesting additional accounts. (Dkt. No. 25, Ex. 27.)

Singleton returned to work on September 6, 2006. At that time, she requested permission to work a reduced schedule. She appears to have provided a human resources employee with a note from her doctor limiting her to no more than three days or twenty hours of work per week. (Dkt. No. 31, Ex. 7, Cross Dep. 114.) Defendants assert that she did not specifically provide Berry, her direct supervisor, with a statement from her doctor regarding a limited work schedule. Regardless of who received the note, both parties do agree that Plaintiff worked a reduced schedule briefly but then returned to working full-time. Plaintiff contends, however, that Defendants required her to resume a full-time schedule in order to keep up with the demands of her position. As a general practice, Sinclair has never had an AE that worked part-time,[2] and the parties disagree about whether an individual could perform the essential functions of the AE position while working a twenty-hour week. Singleton also asserts that she requested help with data-entry tasks as an accommodation, given her health needs. It is undisputed that no such help was provided.

### D. Account Reassignment

In early 2007, Sinclair reassigned some of its advertising accounts. At the time, Defendant employed seven AEs, six women and one man. Singleton was in her forties, as was one other female AE. The one male AE was in his fifties. The other veteran female AE was thirty-three, while the three newest hires were all in their twenties.

Defendants assert, and Plaintiff does not properly dispute, that the reassignment had been in the works for some time. Olander thought the account reassignments were necessary to retain newer AEs

---

**2.** Plaintiff "disputes" Sinclair's claim that it does not offer part-time AE positions without citing any evidence suggesting that Sinclair has ever offered such positions. As discussed in Note 1, *supra,* Plaintiff's bare assertion that a jury could disbelieve Defendants' witness is insufficient to create a material issue of fact.

and participate effectively in a market that had grown more competitive. At the time, the concentration of high value accounts among veteran AEs made it difficult for newer hires to earn sufficient commissions. Plaintiff argues that she was treated unfairly, losing more lucrative accounts than other veteran AEs. The reassignment plan was put into place in early 2007.

Before the reassignment, Plaintiff asserts that her account list had a billing value of approximately $903,000, while a listing of account earnings provided by Defendant shows a value of approximately $887,000, which was the third highest total among the account executives. Based on the 2006–2007 sales numbers provided by Defendant, which are neither conceded nor appropriately disputed by Plaintiff, senior AEs each lost between $113,000 and $150,000 worth of accounts, while the three newest AEs saw the values of their accounts increase between $180,000 and $260,000. To compensate high earners like Plaintiff, the company instituted a "Super Commissions" policy that would have helped them reach their 2006 earnings in 2007 as well. Despite the "Super Commissions" system, only two of the female veteran AEs increased their average monthly incomes, while two of the other veteran AEs, Plaintiff and her one male counterpart, experienced drops in their average monthly earnings. The greatest drop was experienced by the one male AE, who saw his average monthly income decrease by almost two thousand dollars. Singleton's average monthly income during 2007 was approximately $600 lower than it was in 2006.

The reassignments were announced on January 2, 2007. The as-yet unearned commissions for content that had been sold but had not yet aired ultimately went to the AE who was assigned the account at the time the content aired. Singleton complained about the reassignment, which she asserts caused her a net loss of thirty-seven accounts. She believed the reassignments disproportionately affected her due to her gender, age, and disability. In a January 12, 2007 e-mail she accused Berry of discriminating against her because of age and because of her 2006 medical issues.

After Sinclair's Human Resources Department investigated the incidents and found no wrongdoing, the original list of reassignments was modified so that Plaintiff retained certain accounts that either she or her customers requested she retain. Additionally, following the internal company investigation into Plaintiff's complaints, Berry exchanged positions with the National Sales Manager, Gerry Dunn. After this change, which occurred in March 2007, Berry was no longer Plaintiff's direct supervisor.

### E. Plaintiff's Discrimination Complaint

On April 30, 2007, while on her second medical leave, Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), alleging gender, age, and disability discrimination and retaliation on the part of Sinclair. This charge named Berry, together with several other Sinclair employees, only in the factual statement. She filed an additional retaliation charge with the MCAD on September 10, 2007 and again did not name Berry as a respondent.

### F. Plaintiff's Second Medical Leave

Following Plaintiff's initial surgery in June 2006, she was monitored regularly for the recurrence of cancer. She was again scheduled for surgery in April 2007, and she left on a second medical leave on April 13, 2007. Defendant informed her

by letter dated June 1, 2007 that she had used the full amount of unpaid leave employers must provide under the Family and Medical Leave Act (FMLA) as of April 20, 2007, the end of the first week of her second leave of absence. The letter stated that she had taken leave for eleven weeks from June 21, 2006 through September 6, 2006. Thus, the first week of her second medical leave was the twelfth week of leave she had taken during a twelve-month period. Plaintiff now contends that she was unaware that her 2006 leave had been FMLA-qualified leave, despite stating that "[s]he requested, and was granted, medical leave under the Family and Medical Leave Act of 1993" as a fact in her First Amended Complaint. (Dkt. No. 21, at ¶ 10.) The June 1, 1997 letter also requested that Plaintiff provide documentation from her physician setting out when she would be cleared to return to work so that the company could make "business planning decisions." As of the date of that letter, Plaintiff was not able to return to work and did not believe she would be able to return for four to six more weeks.

On June 28, 2007, Sinclair sent Plaintiff a second letter indicating that her accounts would be reassigned to other AEs because it was unknown how long it would be before Plaintiff would return to work. The letter mentioned that Plaintiff might be taking long-term disability. It appears to be uncontested that between June 1, 2007 and July 16, 2007, Plaintiff did not initiate any communication with Sinclair regarding when she expected to return to work, and the two letters described above were the only communications initiated by Sinclair.

Sinclair sent Plaintiff a letter dated July 16, 2007, advising her that it was terminating her employment on that date. In that letter Sinclair stated that it had granted Plaintiff unpaid leave through July 11, 2007 and that she had never advised the company that she would not be returning to work on July 12, 2007. Consistent with its policy to pay account commissions earned while an AE was on leave only after the AE had been back at work for thirty days, Sinclair did not pay Plaintiff any of the commissions that were earned on her accounts during her leave. Singleton claims she was not aware of this policy when she went on leave.

Plaintiff has never obtained a release from her physician allowing her to return to work. Defendants assert that this is evidence that she has been unable to work since the summer of 2007. Plaintiff argues that her failure to get a return-to-work note is not dispositive as to her ability to work.

## G. *Berry's Alleged Discriminatory Behavior*

Berry, now forty-one years old, was the Station's Local Sales Manager ("LSM") and Plaintiff's direct supervisor from January 2006 through March 2007. During his tenure as LSM, Berry supervised between four and seven AEs, only one of whom was male. There is evidence that Berry raised his voice and made disparaging comments about Plaintiff and also to at least two other female AEs; however, there is absolutely no evidence that the disparaging comments referenced the AEs' gender or traits that are stereotypically gender-related and no evidence that he singled out female AEs for abuse because of their gender. There is also undisputed evidence that Berry had yelled at a male Account Executive in the past and that he had difficulty managing all of the "veteran" account executives to some degree.

Plaintiff alleges that in addition to being verbally abusive, Berry singled her out for poor treatment. She asserts that once he

did not report her sales on a significant advertising buy to Sinclair management, that he intentionally prevented the rescheduling of preemptions that accumulated while she was on leave in 2006, and that he was responsible for the allegedly disproportionate reduction in her account list following the reassignments. Finally, she asserts that he created a hostile work environment for herself and other sick employees by running something called a "Dead Pool," in which a group of employees bet on which celebrities they expected to die in the coming calendar year. Although Defendants admit that Berry and others participated in this rather tasteless lottery, Sinclair's management stopped it from going forward on station premises or during work hours as soon as they knew about it.

## III. DISCUSSION

Faced with a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in the nonmovant's favor. *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). Summary judgement is only permissible when the court then determines that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R.Civ.P. 56(c). There is a genuine issue of material fact if a reasonable jury could resolve the issue in favor of the party opposing the summary judgment motion. *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000). "Where ... the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case 'is ... not significantly probative, summary judgment may be granted.'" *Davila v. Corporacion De P.R. Para La Difusion Publica,* 498 F.3d 9, 12 (1st Cir.2007) (citations omitted).

Plaintiff has brought claims against both Sinclair and Berry. The court begins its discussion with the one claim against Berry and then addresses Plaintiff's discrimination claims against Sinclair before turning to the balance of the counts against Sinclair.

### A. *Count II: Claim Against Berry*

Plaintiff alleges that Berry created a hostile work environment in violation of Chapter 151B. In response, Defendant Berry claims that Plaintiff is barred from bringing suit against him because she failed to exhaust her administrative remedies by filing a charge against him before the MCAD. Both parties agree that, although she mentioned him in the facts section of her first MCAD charge, Plaintiff did not name Berry as a respondent. Additionally, Plaintiff did not mention Berry at all in her September 2007 complaint, which related to events occurring after Berry was no longer her supervisor.

██ Under Massachusetts law, plaintiffs must first bring their discrimination claims before the MCAD; otherwise their claims are barred. *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996). The state requires claims to be brought first to MCAD to ensure that employers have notice and an opportunity for conciliation. *Id.* This generally means that a plaintiff cannot add additional claims or additional defendants that are not named in the MCAD charge. *See, e.g., King v. First,* 46 Mass.App.Ct. 372, 705 N.E.2d 1172, 1174 (1999).

Despite this requirement, some courts have found that a plaintiff's failure to name an individual or entity as a respondent before the MCAD is not completely fatal to her ability to name that party in a civil suit. For example, in *Chatman v. Gentle Dental Ctr. Of Waltham,* 973 F.Supp. 228 (D.Mass.1997), the court held that if the

plaintiff's MCAD charge put that party's conduct at issue, and if the party was on notice of the charge and had an opportunity to participate in the MCAD proceeding, then the party may be appropriately named as a defendant in a later civil complaint alleging a violation of Chapter 151B. *Chatman,* 973 F.Supp. at 234; *see also Chapin v. University of Mass.,* 977 F.Supp. 72, 76–78, 81–82 (D.Mass.1997); *Horney v. Westfield Gage Co.,* 95 F.Supp.2d 29, 36 (D.Mass.2000) (allowing plaintiff to proceed with 151B claim where defendant had early notice of potential civil claims against him due to plaintiff's attempt to amend the MCAD complaint).

However, the Massachusetts Appeals Courts that have dealt with this issue in factual circumstances similar to this case have regularly held that a plaintiff's civil claim against a particular defendant is indeed barred by a failure to name the party in the MCAD proceeding. *See King,* 705 N.E.2d at 1174 (Mass.App.Ct.1999) (barring claims against defendant not named as a respondent in the MCAD complaint where plaintiff could have learned the defendant's identity when filing the MCAD complaint); *Powers v. H.B. Smith Co., Inc.,* 42 Mass.App.Ct. 657, 679 N.E.2d 252, 258–59 (1997), *review denied,* 425 Mass. 1105, 682 N.E.2d 1362 (1997) (affirming dismissal of discrimination claims against an individual where, at the time the plaintiff filed his complaint with the MCAD, he was aware of the defendant's involvement in the discriminatory conduct, and the plaintiff could have moved to amend his MCAD complaint, but failed to do so).

■ In this case, though it appears that Berry knew of Plaintiff's MCAD complaint and provided information to Sinclair for the administrative proceedings, there is no indication in the record that Berry had notice that Plaintiff intended to name him as a defendant in an eventual civil suit.

Plaintiff never moved to amend her complaint to add Berry as a respondent, even when she filed a second MCAD complaint. This meant that Berry had no opportunity to settle any potential discrimination claims against him and avoid the expense of defending against a civil suit while either of Plaintiff's complaints were before MCAD. It also denied Berry a full and fair opportunity to answer the factual allegation made against him in the MCAD proceeding.

■ Plaintiff argues that her claim against Berry is not foreclosed because Berry did not raise Singleton's failure to name him as a respondent before MCAD as an affirmative defense. According to Plaintiff, failure to exhaust administrative remedies is a non-jurisdictional defect that is waived unless it is affirmatively pled. She is unable, though, to support her position with citation to cases applying Massachusetts's anti-discrimination statutes. First Circuit law confirms that trial courts may not entertain claims not raised in a timely filed MCAD complaint. *See Brennan v. King,* 139 F.3d 258, 268 (1st Cir. 1998) ("Under Massachusetts law, a timely complaint must be filed with the MCAD before a plaintiff can proceed with an action in the Superior Court.") (internal citation omitted).

Plaintiff's failure to name Berry as a respondent in her MCAD complaint or demonstrate that he had notice of a potential civil suit or an opportunity to conciliate the discrimination claims against him, means that her claims against him are not properly before this court. Berry's motion for summary judgment as to Count II will therefore be granted.

**B. Counts I, III, IV, and VIII: Mass. Gen. Laws ch. 151B Discrimination Claims Against Sinclair**

■ Plaintiff asserts that Sinclair discriminated against her based on disability

(Count I), age (Count III), and gender (Count VII), in violation of Mass. Gen. Laws ch. 151B. In all cases involving discrimination claims, Massachusetts courts employ the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* "pretext" analysis first requires Plaintiff to make out a *prima facie* case of discrimination. *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003). If Plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to present a "legitimate, non-discriminatory reason sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee." *Quinones v. Houser Buick,* 436 F.3d 284, 289 (1st Cir.2006). Once the employer has shown a non-discriminatory reason for the adverse employment action, the burden shifts back to the employee, who must demonstrate that the employer's proffered reasons were pretextual. *Id.*

Sinclair has moved for summary judgment on these discrimination counts on six distinct grounds: (1) As a matter of law, Plaintiff was not disabled during the period before her termination; (2) Plaintiff has never been able to return to work; (3) the account reassignments did not rise to the level of adverse employment action; (4) similarly situated employees were not treated differently; (5) Sinclair's reasons for firing her in July 2007 were not pretextual; and (6) Plaintiff cannot demonstrate a discriminatory motive on Sinclair's part.

Though Plaintiff's counsel has focused almost entirely on the third prong of the *McDonnell Douglas* burden shifting framework, arguing that the issue of pretext is in dispute, Sinclair's motion on the ch. 151B claims will be allowed because, as described more fully below, Plaintiff has failed to make out a *prima facie* case of

discrimination for each of her discrimination claims. The undisputed facts show that Plaintiff was able to work when she returned from her first leave in September 2006, and Sinclair accommodated her needs for a reduced work schedule and additional time off, evenhandedly applied all account reassignments and other actions among male and female account executives of all ages, and gave her some of her accounts back when she complained about the reassignments. In sum, Plaintiff has not produced evidence that could convince a reasonable jury that discrimination of any kind motivated or caused Sinclair's actions.

### I. Count I: Handicap Discrimination

Plaintiff's handicap discrimination claims relate both to the period after she returned to work in September 2006 and to her eventual termination in July 2007.

Under Mass. Gen. Laws Ch. 151B, it is illegal for an employer to discriminate against an employee on the basis of a handicap. Mass. Gen. Laws ch. 151B, § 4(16). To be "handicapped" within the meaning of Chapter 151B, Plaintiff must show: (1) that her condition, actual or perceived, constitutes a mental or physical "impairment;" (2) that the life activity that she claims is curtailed constitutes a "major" life activity, as defined by the statute and its accompanying regulations; and (3) that the impairment "substantially limits" the major life activity. *Prescott v. Higgins,* 538 F.3d 32, 44 (1st Cir.2008) (citations omitted). Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *See, e.g.,* 804 C.M.R. 3.01(5)(a)(3). If a plaintiff claims that she is substantially limited in her ability to perform the major life activity of working, then she must demonstrate that she could

not work in a broad class of jobs and not just one job. *Carroll v. Xerox Corp.*, 294 F.3d 231, 239–40 (1st Cir.2002).

■ Though Plaintiff argues that her cancer prevented her from working, it is undisputed that she returned from her first leave in September 2006, started to work a reduced schedule with some assistance from other account executives, and eventually worked full-time until her second leave in April 2007. In fact, she exceeded her performance goals in 2006.

Thus, though the court acknowledges the difficulties faced by Plaintiff due to her cancer, she did return to work successfully and, following her initial return, was not impaired such that she could not perform the major life activity of working. As far as the law is concerned, she was not disabled after her return in September 2006 in a such a manner that would support her Chapter 151B claim.

■ Additionally, an employee whose disability prevents her from performing the "essential functions" of the job cannot be a "qualified" handicapped person under Chapter 151B. *August v. Offices Unlimited*, 981 F.2d 576 (1st Cir.1992). This may include a physical inability to do the job. *Id.*

Though Plaintiff performed her duties well after her original return to work in September 2006, it is undisputed that she was not able to return to work when her second leave initially expired, never provided her employer with a doctor's note or some other documentation clearing her for work, and never contacted Sinclair to inform the company that she was able to return to work or that she needed reasonable accommodations to be able to do so. As Plaintiff has conceded, the essential functions of the account executive job include traveling to visit clients, some data entry, and performing the tasks necessary to maintain established client accounts and develop new accounts.

Because she never gave any indication to either her employer or to this court that she could perform any of these tasks after her 2007 leave, it is simply not possible to conclude that Plaintiff was capable of carrying out the essential functions of the AE position, with or without accommodation. Thus, Plaintiff has failed to establish that she was a "qualified" handicapped person—as required under Chapter 151B—at the time Sinclair terminated her employment.

■ Plaintiff claims that Sinclair was required to provide her with additional medical leave as a reasonable accommodation of her disability. It is true that a request for a limited extension of medical leave, if there is some definite timetable for the employee's return to work, may constitute a reasonable accommodation under Mass. Gen. Laws ch. 151B, § 4(16). *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 772 N.E.2d 1054, 1064 (2002). But in this case, Plaintiff did not actually request that her leave of absence be extended. While it is true that an employer is required to make a reasonable effort to determine if a request for accommodation is possible, *id.* at 1065, any request for an accommodation must be sufficiently direct and specific to put the employer on notice that an accommodation is needed. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir.2001); *see also Russell*, 772 N.E.2d at 1065; *Conway v. Boston Edison Co.*, 745 F.Supp. 773, 783 (D.Mass.1990). Thus, Sinclair's duty to determine whether further leave was reasonable was never triggered, and it cannot be said to have failed to provide Plaintiff with an accommodation it did not know she required.

■ Even if this court were to assume, *arguendo*, that Plaintiff's failure to communicate a return date was somehow a request for an extension of her leave, whether such an extension is reasonable depends on the facts of the case. *Russell*, 772 N.E.2d at 1064; *see also Criado v. IBM Corp.*, 145 F.3d 437, 443 (1st Cir. 1998) (holding that providing a leave of absence and leave extensions are reasonable accommodations under the Americans with Disabilities Act but that whether the leave request is reasonable turns on the facts of the case). However, providing for an open-ended or indefinite leave extension is not a reasonable accommodation under ch. 151B, § 4(16). *Russell*, 772 N.E.2d at 1064. In this case, it is undisputed that Sinclair extended Plaintiff's leave beyond what was required under state law or the FMLA by two-and-a-half months. In fact, the leave that Sinclair was required to provide expired on April 30, 2007, because Plaintiff used most of her available unpaid leave in 2006. Sinclair initially attempted to accommodate Plaintiff's need for a longer absence, extending her leave through mid-July, before terminating her employment after Plaintiff failed to respond to requests that she provide Sinclair with some indication of when she would be able to return to work.[3] Given Plaintiff's failure to provide Sinclair with some timetable for her return, or to even inform her employer that she required an extension beyond the initial leave Sinclair granted, the court can only conclude that Plaintiff implicitly sought an open-ended or indefinite leave. However, as outlined above, this is not a reasonable accommodation. There-

fore, Sinclair did not discriminate against Plaintiff by failing to provide her with a reasonable accommodation as required under Mass. Gen. Laws ch. 151B.

### ii. *Count III: Age Discrimination*

■ Under both federal law and Massachusetts state law, it is illegal "for an employer to discharge an individual age 40 or older because of [her] age." *Bennett v. St.-Gobain Corp.*, 453 F.Supp.2d 314, 326 (D.Mass.2006) (citing 29 U.S.C. §§ 623(a)(1), 631(a); Mass. Gen. Laws ch. 151B §§ 1(8), 4(1B)). In order to prevail on an age discrimination claim, a plaintiff must prove four elements: (1) membership in the protected class; (2) harm; (3) discriminatory animus; and (4) causation. *Bennett*, 453 F.Supp.2d at 326 (citing *Lewis v. City of Boston*, 321 F.3d 207, 213 (1st Cir.2003); *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502, 751 N.E.2d 360 (2001)). Under the causation prong of the test, "the evidence must be sufficient to show that discriminatory animus was the *determinative* cause" of the harm inflicted on the plaintiff. *Bennett*, 453 F.Supp.2d at 326 (citing *Lewis v. City of Boston*, 321 F.3d at 213; *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 425–26, 780 N.E.2d 1255 (2003)) (emphasis added). Where no direct evidence of discriminatory animus and causation is presented, a plaintiff may establish those elements circumstantially, using the three-stage burden-shifting method of proof set out in *McDonnell Douglas* described above. *Bennett*, 453 F.Supp.2d at 326 (citations omitted).

---

3. It should again be noted that it is undisputed that Sinclair's policy was to terminate employees who were not able to return to work after the expiration of their FMLA-mandated medical leave. While there must be an individualized determination of the reasonableness of a request for extended medical leave, and an employer cannot simply rely on company policies that limit leaves to a set amount of time, *see Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647–648 (1st Cir. 2000), here, because Plaintiff—by failing to communicate a return date—was effectively ʾrequesting an open-ended leave, Sinclair's decision to terminate Plaintiff in keeping with its policy was reasonable as a matter of law.

■ In this case, Plaintiff has failed to provide any evidence that Sinclair unlawfully transferred her accounts to younger account executives and terminated her employment because of her age, as required by the fourth prong of the *prima facie* case. Thus, the court will grant Defendant's motion for summary judgment on the Plaintiff's age discrimination claim.

The facts, viewed in a light most favorable to Plaintiff, show that in early 2007, Sinclair responded to increased competition and an inability to retain recently hired AEs who did not make sufficient commissions income by balancing accounts among account executives. While some younger account executives were given additional accounts in order to provide them with a sustainable level of income, Plaintiff has failed to produce any evidence that discriminatory animus related to her age played any part in this decision, much less that it was the determinative cause of the employer's action. This process affected the distribution of accounts for all of the veteran AEs, both those within the Plaintiff's protected age class and the one AE who was in her thirties at the time of the reassignments. There is simply no evidence that this decision was driven by anything other than ordinary business considerations.

Additionally, any inference of age-motivated animus is rebutted by the fact that Sinclair gave Plaintiff some of her old accounts back in January 2007, after her initial complaints about the arrangement. In fact, where customers requested that Plaintiff continue to handle their accounts, she was permitted to do so. Furthermore, the company instituted a "Super Commissions" policy that was designed to compensate the more senior account executives for their lost income. Simply put, while it is true that some younger account executives with less seniority gained some accounts, there is just insufficient evidence, circumstantial or otherwise, that Sinclair acted to discriminate against Plaintiff on the basis of her age.

Similarly, Plaintiff has produced no evidence that her age motivated her termination in July 2007. Thus, this court will grant Sinclair's motion for summary judgment on Plaintiff's age discrimination claim.

### iii. *Count VIII: Gender Discrimination*

■ Plaintiff has similarly failed to raise a *prima facie* case of gender discrimination under Chapter 151B's framework. Mass. Gen. Laws ch. 151B, § 4(1) states, in the relevant part, that "[i]t shall be an unlawful practice . . . [f]or an employer, by himself or his agent, because of the . . . sex . . . of any individual . . . to discriminate against such individual . . . in terms, conditions or privileges of employment." Mass. Gen. Laws ch. 151B, § 4(1). To establish a *prima facie* case of gender discrimination, Plaintiff must provide evidence: (1) that she was a member of the protected class; (2) that she was subjected to an adverse employment action by her employer; (3) that the employer possessed discriminatory animus against her protected class; and (4) that the discriminatory animus caused the adverse employment action. *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 825 N.E.2d 522, 530 (2005); *see also King v. City of Boston*, 71 Mass. App.Ct. 460, 883 N.E.2d 316, 323 (2008). If a plaintiff does not have direct evidence of a defendant's discriminatory animus or that this animus caused the adverse employment action, the plaintiff may avail herself of the three-stage, burden-shifting *McDonnell Douglas* paradigm mentioned above. *Sullivan*, 825 N.E.2d at 530. The three-stage order of proof "does not circumvent the plaintiff's burden to prove all

the essential elements of a discrimination claim, but does permit the jury to infer discriminatory animus and causation ... in the absence of direct evidence." *Id.* (quoting *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 780 N.E.2d 1255, 1263 (2003)).

 Because Plaintiff in this case has failed to provide any evidence that Sinclair's actions were motivated by a discriminatory animus against Plaintiff related to her gender, this court will grant Defendant's motion for summary judgment on Plaintiff's gender discrimination claim.

Plaintiff claims that the account reassignment process and the unequal pay that resulted from these reassignments provide evidence of gender-based discrimination. However, this argument is not supported by the cognizable facts in the record. First of all, when Sinclair reassigned its accounts in 2007, though they did reassign accounts maintained by the other veteran female AEs, all of the beneficiaries of these reassignments—the three less-experienced AEs—were women. Additionally, the only veteran male AE also lost accounts as a result of the reassignment and made significantly less money per month in 2007 than in 2006. Finally, there is undisputed evidence that, even after the account reassignments, two of the veteran female AEs actually increased their earnings from 2006 to 2007. In other words, Plaintiff has failed to provide evidence of any kind that gender was a factor in this account reassignment decision.

Plaintiff also alleges that gender discrimination motivated Sinclair's decision to terminate her in July 2007. Once again, however, Plaintiff's proof does not rise above the level of bare allegation. As established above, Sinclair terminated Plaintiff in a manner consistent with its leave policies. In fact, Sinclair actually extended Plaintiff's leave beyond the FMLA-mandated date, eventually sending

notice of her termination after she failed to respond to a request that she provide Sinclair with some indication of when she would be able to return to work. As with the other discrimination counts in this case, Plaintiff has simply failed to provide any evidence that her gender played any role in this decision beyond the conclusory allegations of her complaint. Therefore, this court will grant Sinclair's motion for summary judgment as to Count VIII.

### iv. *Count IV: Unlawful Retaliation*

Plaintiff alleges that Sinclair retaliated against her in violation of ch. 151B by "reprimanding her, re-assigning accounts to other Account Executives, and terminating her employment." (Dkt. No. 21 at ¶ 61.)

 Although it does not explicitly use the term retaliation, Massachusetts Gen. Laws ch. 151B makes it unlawful for an employer to:

> discharge, expel or otherwise discriminate against any person because he has opposed any practice forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding.

Mass. Gen. Laws ch. 151B, § 4(4). To make out a *prima facie* case of retaliation under § 4(4), the Plaintiff must show: (1) that she engaged in any of the kinds of protected conduct listed in the statute; (2) that she suffered some adverse action; and (3) that "a causal connection existed between the protected conduct and the adverse action." *Mole v. Univ. of Massachusetts*, 442 Mass. 582, 814 N.E.2d 329, 338–39 (2004) (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 827 (1st Cir.1991)). To satisfy the causation prong, Plaintiff must prove something more than the mere facts that she engaged in protected activity, that her employer knew of her protect-

ed activity, and that some sort of adverse action followed thereafter. *Mole*, 814 N.E.2d at 339; *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 672 N.E.2d 1, 8 n. 11 (1996). Because Plaintiff has failed to show any causal link between her protected activities and Sinclair's decision to balance its account assignments or terminate her, this court will grant Defendant's summary judgment motion on Count IV.

The only adverse employment actions that Plaintiff identifies that actually occurred after she first complained of discrimination were the account reassignments and her eventual termination. However, Plaintiff has failed, as both a factual and legal matter, to establish any causal connection between any potential protected activity and these events.

The undisputed facts in this case show that the account reassignment process began before Plaintiff actually engaged in any conduct that could conceivably be construed as protected activity. After management informed Plaintiff of the impending reassignments, Plaintiff objected to the transfer of her accounts and claimed that Berry was discriminating against her because of her age and her medical issues. Sinclair reacted to her complaints not by retaliating against her, but by responding to her requests and giving her some of her accounts back. Furthermore, as discussed in greater detail above, the account reassignments affected all of the veteran AEs, both male and female, regardless of their age. Thus, Plaintiff cannot plausibly claim that the reassignments were carried out in retaliation for her internal complaints about potential discrimination.

Likewise, Plaintiff has failed to provide any evidence that her termination was in any way related to her protected activity. It is true that the Plaintiff filed her first MCAD complaint on or around April 30, 2007, while she was on her second leave, and that she was terminated in mid-July of the same year. As set out above, Plaintiff must do more than just show that an adverse action occurred after she complained of discrimination. *Mole*, 814 N.E.2d at 339. As previously detailed in greater depth, however, Plaintiff has not provided any sort of evidence that there was a discriminatory motive lurking somewhere behind Sinclair's decision to terminate her. In fact, Sinclair has provided undisputed evidence that, consistent with company policy, it ended her employment with the company after Plaintiff exhausted all of her medical leave and failed to respond to a request that she inform Sinclair when she would be returning. While it may be possible to infer retaliation in certain cases in which an employer takes adverse action in the "immediate aftermath" of an employee's protected activity, *id.* at 339, the intervening months and subsequent events in this case render untenable even a circumstantial inference of retaliation. Thus, Plaintiff has failed to establish the elements of a *prima facie* case of retaliation, and Sinclair's motion for summary judgment as to Count IV will be granted.

## C. *Count V: Breach of Contract.*

Plaintiff claims that Sinclair breached its contractual obligations to her by violating "a valid agreement that Singleton's salary would be paid by commissions earned on her gross sales." (Dkt. No. 5 at ¶ 65.) While it is not entirely clear from Plaintiff's complaint—or from any other documents submitted by the Plaintiff—what agreement, exactly, the Plaintiff is referencing, since the Station's employee handbook sets out some of the basic terms of how AEs are to be paid, this court can only assume that Plaintiff claims that Sinclair violated this "agreement." For its part, Sinclair does not directly dispute that

the employee handbook could be construed as a contractual agreement between itself and its AEs beyond pointing to the express provision in the handbook that states that employees are employed "at-will." Rather, Sinclair contests whether it violated the terms provided in this handbook and the other documents incorporated by reference. Thus, this court will proceed by first examining whether Sinclair breached any contractual agreement regarding the payment of compensation.

■■■■ It is true that representations in an employee manual may, in certain circumstances, become part of an implied employment contract. *Ferguson v. Host Intern., Inc.*, 53 Mass.App.Ct. 96, 757 N.E.2d 267, 271–72 (2001); *Treadwell v. John Hancock Mutual Life Ins. Co.*, 666 F.Supp. 278, 288 (D.Mass.1987). Under Massachusetts law, the terms of any agreement related to employment "must be deduced, construed, and enforced as written." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 7 (1st Cir.2003). Both parties agree that AEs' salaries were based on commissions paid according to an AE's gross sales. Plaintiff claims that Sinclair breached this agreement by deducting her short-term disability benefits from the commissions earned during her first leave, by refusing to pay her the commissions she claims she earned while out on her second leave, and by refusing to make good on some $2,739.98 worth of preemptions.

Plaintiff claims that she is due money from commissions earned during both of her leaves and that Sinclair contractually agreed that commissions should be paid while on leave in accordance with the Employee Handbook. However, the Employee Handbook, on its face, does not lay out how compensation should be handled during a AE's vacation or extended leave. Rather, it states only that compensation for these periods would be "paid according to guidelines established by the General Manager and General Sales Manager" if other AEs were covering the absent AE's accounts during the leave. (Dkt. No. 25, Ex. 5 at SBG//00022.) Plaintiff acknowledges both that other account executives covered her accounts while she was on her first and second leaves and that she never inquired into these additional guidelines until after she returned from her first leave. Meanwhile, Sinclair has produced undisputed evidence that the Station's policy—per its Human Resources Handbook—was to deduct short-term disability payments from commissions earned during a leave and to withhold any commissions earned on an AE's accounts during a leave unless the AE returned to work and worked for at least thirty days. (Dkt. No. 25, Ex. 37 at SBG//0626.)

■■■ Since Sinclair properly deducted the short-term disability benefits from Plaintiff's commissions during her first leave and because Plaintiff did not return to work and work for at least thirty days following her second leave, Sinclair did not breach any agreement related to the payment of commissions while Plaintiff was on leave. Plaintiff has thus failed to establish any dispute regarding whether Sinclair breached the terms of the Employee Handbook or the agreements referenced by that Handbook as they relate to the payment of commissions while an AE is on leave.

■■■ Plaintiff also contends, however, that Sinclair breached the terms of the implied agreement regarding the payment of commissions by failing to make good on $2,739.98 worth of preempted commissions. While Plaintiff seemed to admit in her deposition that all preemptions that occurred while she was on her first leave were made good, she still maintains that there are outstanding preemptions that

were not addressed. Sinclair failed to address this claim in its motion for summary judgment or in its reply to Plaintiff's opposition to its motion. Therefore, Plaintiff is entitled to attempt to prove at trial that the Station did indeed fail to make these preemptions good and that this failure constituted a breach of an implied contract regarding compensation.

 Finally, Plaintiff claims that she was improperly terminated in breach of an implied covenant of good faith and fair dealing. Though, in general, an employer can terminate an at-will employee at anytime, with or without cause, *Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 525 N.E.2d 411, 412 (1988), Massachusetts recognizes an implied covenant of good faith and fair dealing even in at-will employment relationships. *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1255–56 (977). Employers violate this covenant by terminating employees in bad faith in order to prevent them from receiving an earned benefit. *Id.* at 1257. If a Plaintiff can prove bad faith, she is awarded damages for "the loss of compensation that is ... clearly related to an employee's past service." *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 29 (1981).

 In this case, there is simply no evidence that Sinclair fired Plaintiff in order to avoid paying her commissions or disability payments during her leave. As noted repeatedly above, Sinclair's policy regarding medical leave supported Plaintiff's termination upon the exhaustion of her leave. While it is true that Plaintiff would have been entitled to approximately $2,700 had she returned to work, she failed to do so. Sinclair extended her leave beyond the time required by either federal law or its own policies, only terminating Plaintiff after she failed to respond to a request that she provide a framework for her return to work. Plaintiff has failed to point to any evidence of record suggesting that there was any other motive behind her termination. In sum, there is no triable evidence that Sinclair fired Plaintiff in violation of the covenant of good faith and fair dealing. Thus, Sinclair's motion for summary judgment on Count V will be allowed in part and denied in part.

## C. Count VII: Wage Act

 Plaintiff alleges that Sinclair violated the Massachusetts Payment of Wages Act (the "Wage Act") by failing to pay her commissions that were due her.[4] The Wage Act requires the "payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." Mass. Gen. Laws ch. 149 § 148. "The statute was intended and designed to protect wage earners from the

---

4. In her opposition to Sinclair's motion for summary judgment, Plaintiff also included a bare allegation that Sinclair failed to pay her for 49.15 hours of vacation time. The court will assume that Plaintiff meant to imply that this also constitutes a violation of the Wage Act. *See* Mass. Gen. Laws ch. 149, § 148. However, this claim was not part of her original or amended complaint. It was also not included as part of Plaintiff's Rule 56.1 Statement of Material Facts. (Dkt. No. 31.) The only substantiation Plaintiff has for this claim consists of a chart that she generated in prep-

aration for this litigation and submitted as an attached exhibit with her opposition. Additionally, even if Plaintiff had included this claim in her initial complaint or in her Rule 56.1 Statement of Facts, it would fail because Sinclair's clear policy—set out in the Employee Handbook—is that, upon separation, AEs "will receive no pay for unused vacation, sick, or personal days." (Dkt. No. 25, Ex. 15 at SBG//00022.) Thus, this court will also grant Sinclair's motion for summary judgment as it relates to this belated addition to Plaintiff's Wage Act claim.

long-term detention of wages by unscrupulous employers." *Prozinski v. Northeast Real Estate Services, LLC,* 59 Mass.App. Ct. 599, 797 N.E.2d 415, 419 (2003).

While Plaintiff claims that she has "definitely determined" the commissions that were due her upon her termination, as required by the statute, *see Okerman v. VA Software Corp.,* 69 Mass.App.Ct. 771, 871 N.E.2d 1117, 1124–25 (2007), *review denied* 450 Mass. 1102, 875 N.E.2d 863 (2007), she neglects the plain language in the Wage Act stating that the commissions are paid "less allowable or authorized deductions" and only when "due." As discussed above, it is undisputed that Sinclair paid Plaintiff the commissions she was owed following her return from her first leave, less the money Plaintiff received in short-term disability benefits, per the company's policy. Although Plaintiff claims that this was a "secret policy" that was unenforceable, there is undisputed evidence that, on its face, the Employee Handbook did not set out any policy regarding the payment of commissions while on leave. Rather, this policy was set out in a separate document, incorporated by reference in the Employee Handbook. Thus, the deduction of the short-term disability payments was an "allowable or authorized" deduction.

Furthermore, as provided in the policy outlined in the Human Resources Manual, the commissions that Plaintiff "earned" while she was on her second leave were only payable after she returned to work for thirty days. Because she never returned from her second leave, those commissions were not "due" at the time she was terminated. Thus, Sinclair did not violate the Wage Act by deducting her short-term disability payments or by not paying commissions that accumulated while on her second leave.

Finally, Plaintiff claims that she was owed commissions on accounts that were transferred to other AEs and that Sinclair's failure to pay her for those accounts violated the Wage Act. However, as Plaintiff acknowledges, AEs were not entitled to commissions on ad sales at least until the ad aired. Because these accounts were transferred before the ads aired pursuant to a valid reassignment process motivated by legitimate business concerns, Plaintiff was never entitled to any of these commissions. Thus, Sinclair did not violate the Wage Act, and it is entitled to summary judgment on Count VII.

### D. *Singleton's Claim for Punitive Damages*

██ Punitive damages are available under Mass. Gen. Laws ch. 151B, § 9 where a plaintiff can prove that an employer's behavior is outrageous "because of the defendant's evil motive or his reckless indifference to the rights of others." *Dartt v. Browning–Ferris Indus., Inc.,* 427 Mass. 1, 691 N.E.2d 526, 537 (1998) (citation omitted). Because Plaintiff has failed to establish *any* violation of her rights under ch. 151B, this court must grant Sinclair's motion for summary judgment as it relates to Plaintiff's prayer for punitive damages.

### IV. *CONCLUSION*

For the foregoing reasons, Defendant Sinclair Broadcast Group, Inc.'s Motion for Partial Summary Judgment (Dkt. No. 23) is hereby ALLOWED, in part, and Defendant Patrick Berry's Motion for Summary Judgment (Dkt. 24) is hereby ALLOWED.

The trial will proceed—pursuant to the Second Revised Scheduling Order entered by Magistrate Judge Kenneth P. Neiman and the September 17, 2009 Order Regarding Pretrial Conference and Trial dates entered by the undersigned—on

Plaintiff's FMLA claim and a portion of her breach of contract claim, as set forth in Counts VI and V, respectively. *See* Dkt. Nos. 20 and 52.

It is So Ordered.